[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION CT Page 9862
This appeal in a highway condemnation case illustrates both the strengths and the weaknesses of the adversary system of justice. It further raises interesting questions about the way in which professional appraisers, all honorable persons, can differ so greatly in their opinions of the value of the property taken. The disparity in this case between appraisers for the State and those for the property owners was so striking as to raise the question in the trier's mind as to whether they were talking about the same piece of property.
On February 7, 1992, the State of Connecticut took from the defendants, Eric G. Erhardt and George R. Catha, pursuant to General Statutes, Secs. 13a-73(b) and 13b-27, the following described premises:
 Premises situated in the Town of Ridgefield, County of Fairfield, and State of Connecticut, easterly of Sugar Hollow Road and bounded:
 GENERALLY WESTERLY — by lands now or formerly of Marie Ullman and now or formerly of Charles F. Deane, Jr., each in part, a total distance of 831.58 feet, more or less;
 NORTHERLY — by land now or formerly of Eric G. Erhardt, et al. and land now or formerly of the State of Conn. (D.O.T.) each in part, 206.18 feet, by a line designated "Taking Line", as shown on the map referred to by the commissioner of Transportation;
SOUTHEASTERLY
EASTERLY AND
 NORTHEASTERLY — by land now or formerly of the State of Conn. (D.O.T.) a total distance of 727.61 feet;
SOUTHERLY — by land now or formerly of the State CT Page 9863 of Conn. (D.O.T.), a total distance of 200.76 feet.
 And said parcel contains 3.18 acres, more or less, together with all appurtenances, all of which more particularly appears on a map entitled: "Town of Ridgefield, Map Showing Land Acquired From Eric G. Erhardt et al. by the State of Connecticut, Relocation of U.S. Route 7 (Limited Access Highway), Scale 1" = 40', October 1989, Robert Gubala, Transportation Chief Engineer-Bureau of Highways" (116-99-11)
 The premises taken herein are being used for a "Limited Access Designated Highway" U.S. Route 7, from which highway access is denied to and from Plaintiffs' remaining land lying northerly thereof, as shown on the map referred to by the Commissioner of Transportation.
For background, reference is had to a copy of the taking map (Plaintiffs' Exhibit 1). A practical overview of the subject property in relation to its setting is contained in defendant's Exhibits C and D prepared by Amerigo Scarpa, a civil engineer witness for the State. It is noted from Exhibit C that if Mr. Scarpa's map is accurate, a small portion at the northeast corner of the subject property lies in the City of Danbury. This is at odds with the description of the land taken and the taking map which refers to "Town of Ridgefield Map Showing Land Acquired from Eric G. Erhardt, et al. . . ." This difference need not be resolved by the court since the area in dispute, whether in Danbury or Ridgefield, is so small and undevelopable that it is immaterial to the issue of damages for the taking.
The plaintiffs' first witness, John B. Flint, dramatized the strange posture in which the State found itself in this case. To an extent unparalleled in this trier's nineteen years as a trier in Connecticut, the State was clearly and embarrassingly "hoist by its own petard." Flint, who has a B.A. from Haverford College and an M.B.A. from the University of Connecticut, has been an appraiser in Connecticut for sixteen (16) years. He has appraised twenty (20) or twenty-five (25) properties for the State along Route 7. The appraisal which he made on August 9, 1990 was made for the CT Page 9864 State. As a matter of fact, he appeared before this very judge as an appraiser for the State several weeks ago in the case of State v. Dean, involving property contiguous to the subject property in this case. His reputation and integrity are impeccable.
Flint's first appraisal for the State, dated August 9, 1990, was $235,000.00. (Plaintiffs' Exhibit 2 and oral testimony.) Upon request of the State for a second look at the situation, he reappraised the damages as of February 19, 1992 at $220,000.00. (Plaintiffs' Exhibit 3 and oral testimony.) He has been a good enough appraiser for the State for years, including only a few weeks ago. But the State did not choose to use him as a witness in this case — Why? Because his appraisal was too high! The State, having jettisoned its long-standing expert because his honest professional opinion was deemed too high by the head of the appraisal section of the D.O.T., chose to put on two in-house appraisers offering figures so low as to almost be an embarrassment to the State.
The court must ask what such course of conduct does to the integrity of the State's appraisal process when it takes property from our citizens in this democracy. This question in no way is meant to be critical of the D.O.T. officials involved, the State's in-house appraisers, or least of all the Assistant State's Attorney, Kenneth Tedford, who very competently represented the State whilst putting the best face he could on a seriously embarrassing chain of events.
To go back to the question posited — does the D.O.T. shop around for an appraiser who will come in low enough to satisfy its own view of the damages involved? To be fair to the State, there is no doubt that property owners' attorneys would reject an appraisal report they deemed too low. Without further sermonizing, the court will only note that its judgment in this case must of pure logical necessity be affected by the strange scenario outlined above.
At this point, it may be of interest to comment on the appraiser's art. For, despite the efforts of some to portray appraisers' work as pseudo-scientific or substantially objective, it is one of the most subjective of all the types of expert testimony heard in our courts. Naturally, the most obvious point of reference is the identity of the party employing the appraiser. Then, intensely personal factors come CT Page 9865 into play; is the glass half full or half empty; is one an optimist or a pessimist; hopeful or despondent; believing or skeptical; is the day half sunny or half cloudy. Indeed, beauty is in the eye of the beholder. The presence of these very human subjective factors in the appraisal profession will become evident in a brief sojourn through the various appraisers' testimony and appraisals. It is epitomized in the critical issue of which comparables to employ.
To save time, the court will accept the general description of the property taken as described by Mr. Flint. There was no substantial disagreement as to the major features of the property by the other appraisers. The property is a rear 3.18 acre vacant lot zoned for RAA (2 acre) residential in Ridgefield together with a right of way leading to Laurel Lane and thence to Route 7 over land acquired by the State of Connecticut. The property was conveyed from Bacchiochis to the owners on May 4, 1989 for $33,000.00.
The property is in an Aquifer Protection Zone which restricts certain commercial and industrial uses but allows single family residences under certain controlling regulations. The current assessment on the land is $18,970.00. The Town of Ridgefield is a very desirable and affluent, largely residential, community. There are a number of salable commercial buildings lining Route 7 to the west, the backs of which are visible from the subject property as the leaves fall. A portion of a large pond is located along the western edge of the parcel and another small pond is located in the southwestern corner of the site. Public utilities would be available to the property. A well and septic system would be required.
The property was purchased in 1989 for the expansion of the tennis facility located to the north. The clubhouse and associated tennis courts are located in Danbury within a commercial zone. Whether the eventual use would have been connected with the expansion of the tennis facility or as a residential lot, it would be fraught with serious and very expensive developmental costs. Large rock outcroppings and wetlands are found throughout the property and a high rock ledge dominates the northern part of the parcel. Very expensive septic tanks and right of way improvements can be reasonably anticipated. Because of the location on an aquifer and the other associated obstacles to easy development, only CT Page 9866 one certain small area of high dry buildable land presents itself. The cost and income approaches to an appraisal were not used by any expert because all agreed they are not applicable to an undeveloped residential lot. The highest and best use of the property is a single residential lot. The pond and convenient location enhance this use.
Mr. Flint's comparables were reasonably strong, although keeping in mind the subjective aura surrounding the appraisal profession, they appear to the court to be in more elite and certainly more easily accessible and developable areas of Ridgefield. Flint admitted that the subject property has more headaches than his comparables. There might have to be an engineered septic tank. He concluded that this was a marginal property. He denied the court's inquiry as to whether he now felt he was a little too high. Attorney Tedford established very effectively on cross-examination that in the thirty-eight comparable sales Flint considered from the Con-Conn Data Bank, there were other sales than those Flint used of three acres each in the $150,000.00 range. Flint's reply was to cite lots of two acre sales in the $200,000.00 range. All in all, Flint was a highly credible and candid witness, particularly since the appraisal was made for the State, but a little too much on the rosy side of life for the trier. He did not discount the parcel enough in view of the developmental difficulties it involved.
Peter Marsele, the venerable and widely respected assessor of the Town of Bloomfield for forty years, was the plaintiffs', next expert. He has been personally known to the trier for thirty years as an exemplary public servant and a man of great integrity. As with all of the other appraisers in this case, his credentials as a private appraiser are unquestioned, including some work for the D.O.T.
He, independent of Flint's appraisal works, considered the damages as a partial taking resulting in $223,000.00 damages. He discounted liberally the various difficulties in developing the property as follows:
a) access is more than adequate;
b) a fine dry high spot in center of parcel for a house; plenty of gravel base for a septic tank;
CT Page 9867 c) wetlands are basically down where pond is;
d) he allowed a 30 percent discount for the difficulties.
He said the lot is one of a kind with high amenity value.
To weigh Mr. Marsele's contribution to this court's judgment, he is very credible and straight-forward but his legendary sunny personality made his appraisal a little too optimistic for the court.
The defense's first witness was very persuasive. Amerigo Scarpa, P.E., an expert in site planning and engineering, as well as landscape architecture, has testified in various matters hundreds of times, mostly for the State. Despite his reservations about development costs, particularly with regard to rock ledges, he did not deny that a single family residence could be built on the knoll subject to septic tank requirements. He emphasized the great problem on the right of way including the allowable slope, the 12 foot width and extensive grading with stone or gravel. He did not disagree with Marsele's $110,000.00 development cost but took strong exception to Flint's estimate of $10,000.00 for such costs.
Unfortunately, the State's two in-house appraisers, although they are honorable and competent appraisers, lacked credibility in the extreme. Frank Bisson, U-Conn 1960, has been an appraiser for twenty years, the last seven years for D.O.T. He is definitely of the half empty glass type of witness. His report (Defendant's Exhibit E) was made March 22, 1991, and required no update. He stated he was familiar with values in the affected area. As did all the others, he used the comparable sales approach. First, he took into consideration the $33,000.00 purchase price of the property. He sought comparables with ledge but could not find any. But he did locate two sites with water problems being developed in an R-AA zone. He claimed, with some justification in the court's view, that Marsele's Norran Heights comparables were not truly comparable because the land where the development lies is flat, with no water, ledge or access problems. He claims the Norran Heights lots are too good to compare with the subject property, a not unreasonable view.
His testimony weakens disastrously when it comes to his two comparables. CT Page 9868
His second comparable (Reid-Martin) was a 1.65 acre single family lot with good access and some water problems, which sold on November 9, 1989 for $65,000.00. Incredulously, in factoring in this sale in measuring the value of the property taken, he gives no weight whatsoever to the fact that the latter was 3.18 acres. On cross-examination by the plaintiffs' attorney, it was clearly established that the lot in question was gerrymandered into a pelican-like conglomeration of land and that the usable portion of the parcel is less than one-half acre.
His third comparable, the Martin-Leary sale on July 3, 1990 of 1.019 acres for $50,000.00, was also seriously undermined on cross-examination. He admitted that this comparable was a marginal lot. Once again, he gave practically no weight to the fact that he was comparing a one acre lot to a three acre lot. It is noted, with credit to his supervisor in the appraisal section of D.O.T., that his boss thought his damages figure of $50,000.00 was too low. In appraisers' lingo, he definitely "low-balled" the property.
A much more realistic appraiser was the State's second in-house appraiser, Rosario A. Ferraro. He is also an honorable and well qualified appraiser having been with D.O.T. twenty-five years, the last ten as an appraiser. He also looks on the gloomy side of appraisal values but in a much more defensible posture than Mr. Bisson. His appraisal (Defendant's Exhibit F) dated April 22, 1991 found damages to be $80,000.00, the taking figure. He updated his study on February 7, 1992 and made no change. He was a commendably candid and flexible witness. His comparables 2 and 3 were the same as Bisson's 2 and 3. He considered Bisson too pessimistic and Flint (with his associate Stryker) too optimistic. He did not use the $33,000.00 sale from Bacchiochis to Erhardt, et al. This is a convenient place for the court to state that it credits Mr. Eberhardt's testimony that the $33,000.00 sales price for the property in 1989 was an updated version of a handshake deal for $25,000 in 1977 and did not reflect market value at the time of the sale.
Under further cross-examination, considering certain weaknesses in his comparables, he adjusted his original estimate of taking damages from $80,000.00 to $90,000.00, thus immeasurably adding to his credibility. Mr. Ferraro conceded CT Page 9869 that his comparable number 1, Ferraro to Kwalwassen for $72,000 on Marie Lane, giving an extrapolated value to the subject property of $80,000.00, was weakened since it was only 0.354 acres. The fact is this comparable could be used as strong evidence for the plaintiffs' case. Further, it developed on cross-examination, that a variance had been granted for an undersized lot subject to two very limiting conditions, namely, that the house shall be limited to a two bedroom dwelling and that the square footage of the house shall not exceed 1,500 square feet. (Plaintiffs' Exhibit 10.)
The court is thus faced with an unusual site with very severe developmental problems with reasonably credible appraisals of the taking damages ranging from Ferraro's $90,000.00 to Flint's $220,000.00 and Marsele's $223,000.00. A visit to the site accompanied by counsel and other professionals jelled the conflicting evidence in the court's mind. A careful examination of the site and numerous comparables utilized by both contesting parties impels the following findings. The right of way over Laurel Lane and then largely over a rocky narrow undeveloped passway through the woods is a definite disadvantage to the property. Estimates of development costs of the site ranged from Flint's $10,000.00 through Ferraro's $60,000.00 to $70,000.00 to Marsele's $100,000.00 plus. From a careful bumpy ride over the right of way, the court concludes that the cost of widening, clearing, and surfacing of the right of way will be in the tens of thousands of dollars. When one adds a probable engineered septic system, rock and ledge problems, and other site expense, the reasonable cost of site improvement is somewhere between Ferraro's and Marsele's figures. The right of way, while not much more than just passable in spots, is also very scenic and would undoubtedly appeal to those who favor rural privacy in a sylvan setting.
The site itself, especially the knoll where all agree a single family house would be placed, is very appealing. The privacy and view and use of the pristine lake adds value. A disadvantage is rocky outcroppings in many areas and a view of the rear of some of the Route 7 commercial buildings some hundreds of yards to the west. Although the State's appraisers found the 150 foot — 200 foot rocky ledge in the northern part of the site to be a disadvantage, to a lover of the rock by-products of a glacial age, the very large and prominent expanses of rock on the site add charm to the property. CT Page 9870
A careful view of some of the comparables is the glue that holds this opinion together. The Marie Lane lot of about one-third of an acre used by both State appraisers is a cramped declining lot jammed in among very small modest houses on what appear to be equally small lots. It is, however, not too far from Ridgefield Lakes. Its sales price of $72,000.00 does not argue for a finding of low damages but quite the contrary. The Mine Hill comparable of Flint where two acres of flat easily accessible land sold for $187,500.00 in February 1992, is very persuasive on the high side. The same comment could be made on the Johnson-Wilson comparable in a nice area, $200,000.00 for two acres in December, 1991. The Norran Heights comparables cited by Marsele give rise to mixed conclusions. This is flat easily accessible property improved with magnificent homes ranging up over $1,000,000.00 in cost. Here, three empty lots ranging from one and one-half to one and three-quarter acres sold in the middle of 1991 in the neighborhood of $200,000.00 each. The court examined each of these lots with care. Although they were attractive and wooded, they sloped to the rear and have at least minor developmental problems.
Although the following formula is by no means the sum of the court's consideration of this case, a handy catch-all may be used. The evidence clearly establishes that on March 7, 1992, the date of taking, prime residential RAA property in Ridgefield had a fair market value of $100,000.00 per acre. From this the value of the subject property is $300,000.00. We must, however, deduct from this, to be on the safe side, $100,000.00 for development costs to develop the site into a fine single family home in a beautiful rustic setting overlooking a small untrammeled pond. Therefore, the court concludes that the fair market value of the subject property on the day of taking was $200,000.00. The court reassesses the damages of the property owners to $200,000.00.
T. Clark Hull State Trial Referee